**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **NELSON SOARES,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **HEIMDAL SECURITY d/b/a** | ) |
| **HEIMDAL SECURITY, INC. d/b/a** | ) |
| **HEIMDAL SECURITY US INC. d/b/a** | ) |
| **HEIMDAL SECURITY A/S,** | ) |
| | ) |
| **HEIMDAL SECURITY, INC., d/b/a** | ) |
| **HEIMDAL SECURITY d/b/a** | ) |
| **HEIMDAL SECURITY US INC., d/b/a** | ) |
| **HEIMDAL SECURITY A/S,** | ) |
| | ) |
| **HEIMDAL SECURITY US INC. d/b/a** | ) |
| **HEIMDAL SECURITY d/b/a** | ) |
| **HEIMDAL SECURITY, INC. d/b/a** | ) |
| **HEIMDAL SECURITY A/S,** | ) |
| | ) |
| **HEIMDAL SECURITY A/S d/b/a** | ) |
| **HEIMDAL SECURITY d/b/a** | ) |
| **HEIMDAL SECURITY, INC., d/b/a** | ) |
| **HEIMDAL SECURITY US INC d/b/a** | ) |
| | ) |
| **MARLIN EQUITY PARTNERS, LLC d/b/a** | ) |
| **HEIMDAL SECURITY d/b/a** | ) |
| **HEIMDAL SECURITY, INC. d/b/a** | ) |
| **HEIMDAL SECURITY US INC. d/b/a** | ) |
| **HEIMDAL SECURITY A/S,** | ) |
| | ) |
| **SECURE TALENT, INC. d/b/a** | ) |
| **EASTRIDGE WORKFORCE SOLUTIONS,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **NN ROAD, INC.,** | ) |
| **Defendants.** | ) |

1

## COMPLAINT

NOW COMES, Plaintiff, NELSON SOARES ("Plaintiff"), by through his attorneys, Kreitman Law, LLC, with his Complaint against Defendants HEIMDAL SECURITY, HEIMDAL SECURITY, INC., HEIMDAL SECURITY US INC., HEIMDAL SECURITY A/S, (collectively "HEIMDAL DEFENDANTS"), MARLIN EQUITY PARTNERS, LLC, SECURE TALENT, INC. and NN ROAD, INC., (collectively "Defendants") and states as follows:

## JURISDICTION AND VENUE

1. The jurisdiction of this court is invoked to secure protection of and to address deprivation of rights secured by 42 U.S.C. §1981 (b) providing for compensatory, punitive, and other relief for employment discrimination based upon race and retaliation. Jurisdiction of this court is based upon federal questions, 28 U.S.C. § 1331.

2. Venue in this district is proper under 28 U.S.C. § 1391 (B). The Defendants conduct business in this district and the events giving rise to Plaintiff's claims occurred here.

## PARTIES

3. At all times material to this Complaint, Mr. Soares lived at 6324 North Keeler Avenue in Chicago, Illinois.

4. At all times material to this Complaint, Mr. Soares's race and color were 50% Black (African) and 50% White.

5. At all times material to this Complaint, Defendant **Heimdal Security** d/b/a Heimdal Security, Inc. d/b/a Heimdal Security US INC. d/b/a Heimdal Security A/S ("Defendant Heimdal Security"), owned and/or managed and/or directed and/or operated a security software firm, advertising and selling software in the USA, including to customers in Chicago, Illinois, out of an office located at 7250 Dallas Parkway, Suite 400, Office 30, Plano, TX.

2

6.     At all times material to this Complaint, Defendant **Heimdal Security, Inc.** d/b/a Heimdal Security d/b/a Heimdal Security US INC. d/b/a Heimdal Security A/S ("Defendant Heimdal Security, Inc.") owned and/or managed and/or directed and/or operated a security software firm, advertising and selling software in the USA, including to customers in Chicago, Illinois, out of an office located at 7250 Dallas Parkway, Suite 400, Office 30, Plano, TX.

7.     At all times material to this Complaint, Defendant **Heimdal Security US INC. d/b/a** owned and/or managed and/or directed and/or operated a security software firm, advertising and selling software in the USA, including to customers in Chicago, Illinois, out of an office located at 7250 Dallas Parkway, Suite 400, Office 30, Plano, TX.

8.     At all times material to this Complaint, Defendant **Heimdal Security A/S** d/b/a Heimdal Security d/b/a Heimdal Security, Inc. d/b/a Heimdal Security US INC. ("Defendant Heimdal Security A/S") owned and/or managed and/or directed and/or operated a security software firm, advertising and selling software in the USA, including to customers in Chicago, Illinois, out of an office located at 7250 Dallas Parkway, Suite 400, Office 30, Plano, TX.

9.     At all times material to this Complaint, **Defendant Heimdal Security A/S** had a corporate headquarters located at VESTER FARIMAGSGADE 1, 2 SAL, 1606 Copenhagen, Denmark.

10.     Defendant **Marlin Equity Partners, LLC** d/b/a Heimdal Security d/b/a Heimdal Security, Inc. d/b/a Heimdal Security US INC d/b/a Heimdal Security A/S ("Defendant Marlin Equity Partners LLC") owned and/or managed and/or directed and/or operated a security software firm, advertising and selling software in the USA, including to customers in Chicago, Illinois, out of an office located at 7250 Dallas Parkway, Suite 400, Office 30, Plano, TX.

11. Defendant Marlin Equity Partners, LLC, had a corporate headquarters located at 338 Pier Avenue, Hermosa Beach, CA 90254.

12. In March 2020, Defendant Marlin Equity Partners, LLC purchased Defendants Heimdal Security, Heimdal Security, Inc., Heimdal Security US INC., Heimdal Security A/S.

13. At all times material to this Complaint, Defendants Heimdal Security, Heimdal Security, Inc., Heimdal Security US INC., Heimdal Security A/S relied upon the legal and management personnel of Defendant Marlin Equity Partners LLC.

14. Collectively, Defendants Heimdal Security, Heimdal Security, Inc., Heimdal Security US INC., Heimdal Security A/S and Marlin Equity Partners, LLC are referred to as "Heimdal Defendants".

15. At all times material to this Complaint, each of the Heimdal Defendants had fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

16. At all times material to this Complaint, each of the Heimdal Defendants had at least one employee for each working day in the State of Illinois.

17. At all times material to this Complaint, Valentin Stilling ("CSO Stilling") was the Chief Sales Officer ("CSO") of the Heimdal Defendants and was acting within the scope of his agency and/or apparent agency for Defendants.

18. At all times material to this Complaint, CSO Stilling's sex was male and race and color was White. At all times material to this Complaint, CSO Stilling had knowledge of Mr. Soares's sex, race and color.

4

19. At all times material to this Complaint, Mark Wheelhouse ("CFO Wheelhouse") was the Chief Financial Officer of the Heimdal Defendants and was acting within the scope of his agency and/or apparent agency for Defendants.

20. At all times material to this Complaint, CFO Wheelhouse's sex was male and race and color was White. At all times material to this Complaint, CFO Wheelhouse had knowledge of Mr. Soares's sex, race and color.

21. At all times material to this Complaint, Defendant Morten Kjaersgaard ("CEO Kjaersgaard") was the Chief Executive Officer ("CEO") of the Heimdal Defendants and was acting within the scope of his agency and/or apparent agency for Defendants.

22. At all times material to this Complaint, CEO Kjaersgaard's sex was male and race and color was white. At all times material to this Complaint, CEO Kjaersgaard had knowledge of Mr. Soares's sex, race and color.

23. Defendant **SECURE TALENT, INC.** d/b/a EASTRIDGE WORKFORCE SOLUTIONS ("Defendant Eastridge") owned and/or managed and/or directed and/or operated a staffing and personnel management company in the software field, advertising and selling services in the USA, including to customers in Chicago, Illinois and had a corporate headquarters located at 2385 Northside Drive, Suite 250, San Diego, CA 92108.

24. Defendant Eastridge had fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

25. Defendant **NN ROAD, INC.** ("Defendant NN ROAD") owned and/or managed and/or directed and/or operated a staffing and personnel management company in the software field, advertising and selling services in the USA, including to customers in Chicago, Illinois and had a corporate headquarters located at 75 East Santa Clara Street, Floor 6, San Jose, CA 95113.

26.     **Defendant NN ROAD, INC.,** had fifteen or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

27.     At all times material to this Complaint, the Heimdal Defendants, Defendant Eastridge, Defendant NN Road, Inc. had knowledge of Mr. Soares's sex, race and color.

## COMMON FACTUAL ALLEGATIONS

28.     In Spring 2020, Mr. Soares was contacted by a former coworker named Suzan Kerlo (Ms. Kerlo"), who was now employed in sales position in the United Kingdom division for the Heimdal Defendants.

29.     Ms. Kerlo's sex was female and race and color was White.

30.     At all times material to this Complaint, Ms. Kerlo had actual knowledge of Mr. Soares's race and color.

31.     Ms. Kerlo had been recently hired by the Heimdal Defendants and was struggling to make sales production and sought advice from Mr. Soares.

32.     Ms. Kerlo requested Mr. Soares's assistance in securing an introduction with an individual named Bobby Ford.  Mr. Ford worked at Unilever and Ms. Kerlo was attempting to secure Unilever as a customer for Heimdal Defendants.

33.     Ms. Kerlo wanted Mr. Soares's assistance because of Mr. Soares's existing relationship with Mr. Ford and because Mr. Ford had not been responsive with Ms. Kerlo.

34.     On or about June 2020, Mr. Soares was negotiating for his own sales position with the Heimdal Defendants.  During this time, Mr. Soares was in Chicago, Illinois.

35.     On or about June 2020, over a video call, Ms. Kerlo again discussed Mr. Soares making an introduction to Mr. Ford.

36.     Since Mr. Soares was negotiating his own position at the Heimdal Defendants at the time and could potentially make the sale himself and take the entire commission, Mr. Soares offered to help Ms. Kerlo with an introduction to Mr. Ford in exchange for 50% of the commission Ms. Kerlo would earn from securing a contract with said customer.

37.     During this video call, Mr. Soares was in Chicago, Illinois.

38.     Given that the size of the transaction at issue was anticipated to be over one million euros, Ms. Kerlo's anticipated commission would start at a minimum of 20% of the transaction value and would be substantial.  Both Ms. Kerlo and Mr. Soares knew this at the time.

39.     During this video call Ms. Kerlo agreed to pay Mr. Soares 50% of her commission for and introduction to his customer contact.

40.     On or about June 2020, Ms. Kerlo consulted on multiple occasions about the sales approach to Mr. Ford and Unilever with Mr. Soares.

41.     On or about June 2020, Mr. Soares made the introduction to Mr. Ford on behalf of Ms. Kerlo.

42.     Following this introduction, Mr. Soares continued to work on developing Unilever as a client for Ms. Kerlo pursuant to their agreement he was to a share of her commission.

43.     During this time, Mr. Soares was also negotiating with Ralph Renna, U.S. Sales Director for the Heimdal Defendants to work for the Heimdal Defendants.

44.     Mr. Renna's sex is male, and race and color is White.

45.     At all times material to this Complaint, Mr. Renna had actual knowledge of Mr. Soares's sex, race and color.

46.     Mr. Soares was located in Chicago, Illinois during these negotiations.

47. On July 14, 2020, Mr. Renna sent Mr. Soares an employment contract for the position of Senior Global Enterprise Security Manager responsible for sales of Heimdal Security brand software at the enterprise level.

48. As sales executive for the Heimdal Defendants, Mr. Soares was retained to use his existing business contacts to assist in the global expansion of enterprise level customers for the Heimdal Defendants.

49. As part of his responsibilities, Mr. Soares was also to staff a team and eventually open a remote office for himself and any team members in Chicago, Illinois.

50. The cover page for the July 14, 2020 employment contract included "HEIMDAL SECURITY US INC" on "Heimdal Security" letterhead.

51. In the position description the contract stated "You will be employed in the position of Sr Global Enterprise Security Manager with Heimdal Security (The Company[sic] starting on August 1, 2020".

52. The signature line was between "Nelson Da Silva Soares" and "Heimdal Security, Inc. ("Company")" signed on behalf of "Ralph Renna" "Title Country Manager, North America".

53. Mr. Soares executed said employment contract on July 14, 2020, from Chicago, Illinois, and sent it back to Mr. Renna.

54. On or about August 1, 2020, Mr. Soares began his employment with the Heimdal Defendants and worked remotely from Chicago, Illinois with the purpose of establishing a remote office in Chicago, Illinois.

55. Defendant Eastridge managed human resources and payroll for Heimdal Defendants, including providing some onboarding trainings.

56. Defendant NN Road managed human resources and payroll for Heimdal Defendants.

57. As part of his employment with the Heimdal Defendants, Mr. Soares was required to apply and also be employed by Defendant Eastridge.

58. On or about August 6, 2020, Mr. Soares was hired by Defendant Eastridge with the job title "security operations specialist".

59. Shortly thereafter, Defendant Eastridge "assigned" Mr. Soares to work for Defendant NN Road, a "customer" of Defendant Eastridge.

60. While employed by the Heimdal Defendants, Mr. Soares communicated regarding payroll with Melissa Moniger, Defendant Eastridge's "Account Manager" for the Heimdal Defendants.

61. While employed by the Heimdal Defendants, Mr. Soares communicated regarding payroll and online training issues with Defendant NN Road's employee Ilina Lin.

62. The Heimdal Defendants, Defendant Eastridge and Defendant NN Road jointly employed Mr. Soares from August 2020 through his termination on October 22, 2020.

63. During Mr. Soares's employment with Defendants, his direct supervisor was Mr. Renna, although Mr. Soares territory was global not limited to North America.

64. After Mr. Soares's was hired by Heimdal Defendants, Ms. Kerlo and Mr. Soares continued to work on retaining Unilever as a client through Mr. Soares's contact, Mr. Ford.

65. During one of these conversations, Ms. Kerlo brought up the agreement to share her commission 50/50. Mr. Soares said that due to the potential size of the commission he could be flexible with the split as there would be enough to make everyone happy.

66. During his employment with Heimdal Defendants, Mr. Soares observed managers and salespeople discussing agreements to split commission between salespeople on multiple occasions over video conference calls.

67. During his employment with Heimdal Defendants, written commission split agreements were not required between Heimdal Defendants sales force.

68. During his employment with Heimdal Defendants, Mr. Soares also observed managers and salespeople discussing agreements to split commission with individuals outside of the Heimdal Defendants, usually referred to as "channel partners" on multiple occasions over video conference calls.

69. Commission splitting between salespeople and with those outside of the organization who could make sales occur was a regular practice in this industry and at the Heimdal Defendants.

70. Mr. Soares discussed a number of potential channel partnerships with Mr. Renna during his employment with Heimdal Defendants who gave him positive feedback on the ideas.

71. Throughout his employment, Mr. Soares felt his experience and sales ability questioned and diminished by CSO Stilling.

72. Through his employment, CSO Stilling delayed Mr. Soares's training, which was CSO Stilling's responsibility, and ignored Mr. Soares's phone calls.

73. In September 2020, Mr. Soares invited Ms. Kerlo to a social gathering with some of his business contacts in London, United Kingdom.

74. At this event, discussing sales techniques unrelated to any prospective or current customers of the Heimdal Defendants, Ms. Kerlo discussed her own approach with Mr. Soares, stating to the effect "women will always get what they want, especially from people, *like yourself*."

75. Mr. Soares felt the comment inappropriate and to mean that Black men would negotiate less effectively with White women due to physical attraction to White women but did not report the comment as it was not concerning work.

76. Mr. Soares also felt the resort to racial commentary by Ms. Kerlo may have been related to his prior rejections of suggestive advances by Ms. Kerlo.

77. Mr. Soares continued to work with Ms. Kerlo on securing a contract with Unilever, and on or about early October 2020, secured a meeting with Mr. Ford.

78. On or about October 9, 2020, Mr. Soares messaged Ms. Kerlo to discuss the approach to be taken with Mr. Ford with regard to a meeting regarding the Unilever sale.

79. Instead of replying, Ms. Kerlo video called Mr. Soares.

80. On this video call, Ms. Kerlo told Mr. Soares to the effect "you need to understand I will always get one over on you because I'm White and your Black, and you are wasting your time pursuing Bobby Ford" and that she was not going to pay him any share of the commission.

81. Mr. Soares said that there was no reason to make the situation racial, and not only did they have an agreement for a commission share but that she simply did not earn the entire commission since Mr. Ford was his contact and he had organized the meeting. At this point, Ms. Kerlo ended the call.

82. Ms. Kerlo reneged on her agreement with Mr. Soares because of his race and sex, thinking she was entitled to the full commission as she was a White woman who would ultimately close the deal due to her perceived appeal to Black men.

83. During the exchange, Ms. Kerlo lost her temper and swore and Mr. Soares, and at no point did Mr. Soares swear because he was confident of their agreement and that his contributions earned a share of the commission.

84.     Ms. Kerlo then messaged Mr. Soares over WhatsApp, instead of the Heimdal Defendants' Microsoft Teams app chat, stating that they did not agree to split the commission and disputing Mr. Soares had any involvement.

85.     Ms. Kerlo also accused Mr. Soares of being "very aggressive" and "threatening" her in an attempt to create a paper trail to negate their agreement and portray her racist and sexist actions in a sympathetic light.

86.     Mr. Soares disagreed, stating that he had made the introduction, sharing Mr. Ford's personal cellphone that Mr. Kerlo did not have, and said to the effect that it was inappropriate to try to take full credit for the deal simply because she was White and he was Black.  Mr. Soares said to the effect that it was irrelevant that Ms. Kerlo denied his involvement as the facts supported his involvement and right to a commission split.

87.     Mr. Soares then video called Mr. Renna.  Mr. Soares reported the derogatory racial remark made by Ms. Kerlo, explained the circumstances of his involvement in developing Unilever as a prospective customer and explained that there was an agreement for a commission split between him and Ms. Kerlo.

88.     During the video call, Mr. Renna looked up the Heimdal Defendants Salesforce record for Mr. Ford and Unilever and confirmed Mr. Soares's account of events regarding his involvement in contacting Mr. Ford and arranging the sales meeting.

89.     Mr. Renna said he would be escalating the issue regarding the racial remarks and Ms. Kerlo's attempt to claim full credit for the prospective Unilever sale.

90.     Over the following week, Mr. Soares continued to discuss the issue of the derogatory racial remarks and the Unilever sale commission split with Mr. Renna, and Mr. Renna

12

told Mr. Soares that he was involving the Heimdal Defendants' UK/Ireland County Manager, Ruth Schofield, and CSO Stilling.

91. Ms. Schofield's sex was female and race and color was White.

92. At all times material to this Complaint, Ms. Schofield had knowledge of Mr. Soares's sex, race and color.

93. During this week, Mr. Soares forwarded to Mr. Renna screenshots of the WhatsApp messages between Ms. Kerlo and himself.

94. On or about October 15, 2020, Mr. Renna began removing Mr. Soares from sales calls.

95. On or about the early morning of October 20, 2020, CFO Wheelhouse forwarded the "Heimdal Security Employee's Handbook" as an attachment email to all employees of the Heimdal Defendants, including Mr. Soares.

96. This was the first employee handbook received by Mr. Soares from the Heimdal Defendants.

97. Following this email, CSO Stilling and Mr. Renna video called Mr. Soares, but had their videos turned off.

98. Mr. Renna began the call stating to Mr. Soares to the effect "You are not going to like what we have to say, but we have to get rid of you."

99. CSO Stilling then interjected and said that he wanted the "transition" to be as amicable as possible.

100. Mr. Soares was surprised and confused and asked what the grounds were for his termination. Mr. Soares asked CSO Schilling if he knew what he was doing.

101. CSO Schilling then stated that Mr. Soares was "too aggressive" with Ms. Kerlo because she was a woman and could not accuse a woman of racism over a disagreement and that the accusation constituted "gross misconduct".

102. Mr. Soares disputed these remarks and questioned CSO Schilling if he was really going to terminate him for reporting a racist comment and whether Mr. Renna had explained the comment and context of Ms. Kerlo's statement.

103. Mr. Soares asked Mr. Renna if he even mentioned to Defendant Stilling what had happened.

104. CSO Stilling ended the meeting saying that he would discuss the matter further with Mr. Renna and follow up with Mr. Soares.

105. Later the afternoon on or about October 20, 2020, CSO Stilling called Mr. Soares back, and again stated that he was far too aggressive with Ms. Kerlo as a woman and that Mr. Soares could not accuse her of racism as she was not racist.

106. Mr. Soares asked if Mr. Renna had shown his WhatsApp messages with Ms. Kerlo and asked the basis for stating he was aggressive.

107. CSO Stilling admitted he had not reviewed the WhatsApp messages, but stated that he was "sorry" but that the decision was out of his hands and that there would be further follow up.

108. Following this call, Mr. Soares sent an email to the individuals responsible for terminating him, except Ms. Ruth: Mr. Renna, CSO Stilling, CFO Wheelhouse and CEO Kjaersgaard.

109. In this email, Mr. Soares stated to the effect that he could not believe that reporting a derogatory remark somehow constituted gross misconduct and that the lack of investigation was

14

further racially discriminatory and an example of what people of color have to endure in the workplace.

110. Mr. Soares also complained of the dismissive treatment he had received from CSO Stilling generally.

111. In the email, Mr. Soares noted that no investigation had been done and that he was denied an opportunity to see the Complaints in writing and an opportunity for a hearing on the Complaints as set forth in the Employee Handbook emailed earlier that morning.

112. The following morning on or about October 21, 2020, CSO Stilling replied via email, ignoring the racially derogatory remark that Mr. Soares complained about from Ms. Kerlo entirely.

113. CSO Stilling instead focused on denying that he made any decision based on Mr. Soares's race, stating:

"The fact that you imply that race have anything to do with our decision to terminate is extremely hurtful, especially given my family background (which you clearly assume is different than it was), and I simply won't stand for it and it just shows that you don't listen to what we say and why you have been suspended."

114. Rather than comment on any investigation into the complained racial remark, CSO Stilling responded by defending Ms. Kerlo, stating he felt that Mr. Soares was acting abusive towards Ms. Kerlo and concluded:

"The fact that you without just cause would claim that I have targeted you in any way is extremely worrysome, frankly sickening and ungrounded."

115. CSO Stilling further falsely stated Mr. Soares's exploration of channel partnerships was "close to bribery", even though such channel partnerships were a regular practice at the

Heimdal Defendants and in the industry, and had been discussed by Mr. Soares with approval with Mr. Renna.

116. Mr. Soares replied, denying that CSO Stilling's false implication that he had called Defendant Stilling racist, and restating that the employment action taken against him was not investigated whatsoever as Mr. Soares had acted professionally in the context of a racially inflammatory actions by Ms. Kerlo and had committed no wrongdoing.

117. CEO Kjaersgaard finally replied, also ignoring Ms. Kerlo's racist remark and behavior towards Mr. Soares.

118. CEO Kjaersgaard stated he read the WhatsApp messages and found them "abusive" towards Ms. Kerlo, without mention of any conduct of Ms. Kerlo and stated he found Mr. Soares's prior email to the executives involved in terminating him "offensive".

119. CEO Kjaersgaard then stated that there would be a meeting for a resolution.

120. Later that morning, Mr. Soares received an email invitation to a "Gross Misconduct" hearing scheduled for October 21, 2020, where now he was accused of gross misconduct in violating the "Anti-Bribery" section of the Employee Handbook distributed on or about October 20, 2020.

121. Per October 20, 2020 Employee Handbook, Mr. Soares was permitted to have an employee witness the meeting.

122. Mr. Soares chose Alan Stutts to be his witness at the meeting. Mr. Stutts's sex is male and race and color is White.

123. On or about October 21, 2020, Mr. Soares submitted a written complaint of retaliation based on his reporting of Ms. Kerlo's racist conduct to Defendant Eastridge, which was acknowledged as received.

16

124. On or about October 21, 2020, the "Gross Misconduct" hearing was conducted over Microsoft Teams video, with Mr. Stutts, Mr. Renna, CFO Wheelhouse and CSO Stilling in attendance.

125. Mr. Renna CFO Wheelhousing and CSO Stilling had their cameras off during this meeting.

126. Since these individuals initiated the meeting without cameras on, Mr. Stutts and Mr. Soares turned their cameras off as well.

127. Mr. Stutts attended the meeting remotely from Illinois.

128. Mr. Soares attended the meeting remotely from Chicago, Illinois.

129. At the meeting, the interaction between Mr. Soares and Ms. Kerlo was largely ignored. It rather focused on a specific channel partnership proposed by Mr. Soares that Mr. Renna had discussed positively with Mr. Soares.

130. Following the meeting, CFO Wheelhouse recommended to CEO Kjaersgaard termination on the pretexual grounds of the "Anti-Bribery" allegations since it would avoid the issue of "racial abuse", and because "the less ammo we can give him the better".

131. CFO Wheelhouse also asked Defendant Kjaersgaard whether review by legal counsel for Defendant Marlin Equity Partners, LLC was appropriate.

132. CEO Kjaersgaard approved the decision of CSO Stilling, CFO Wheehouse and Mr. Renna to terminate Mr. Soares.

133. On or about October 22, 2020, Mr. Soares's employment with the Defendants was terminated.

134. Defendants, by and through their agents and/or apparent agents, ratified the racist actions of Ms. Kerlo by terminating Mr. Soares.

17

135. Defendants, by and through their agents and/or apparent agents, would not have pulled Mr. Soares from calls, told Mr. Soares he was terminated on or about October 20, 2020 and subsequently terminated him on or about October 22, 2020, but for his sex, male, and/or his race and color, Black/African and/or because he reported racial remarks and actions by Ms. Kerlo and any reasons to the contrary are purely pretextual.

136. In the alternative, Defendants were at least impermissibly motivated to pull Mr. Soares from calls, tell Mr. Soares he was terminated on or about October 20, 2020 and subsequently terminate him on or about October 22, 2020, by Mr. Soares's sex, male and/or his race and color, Black/African and/or because he reported racial remarks and actions by Ms. Kerlo and any reasons to the contrary are purely pretextual.

137. On or about October 30, 2020, Defendant Eastridge and Defendant NN Road sent Mr. Soares a notice that his employment was terminated.

138. At all times material to this Complaint, Mr. Soares met or exceeded the legitimate business expectations of Defendants.

139. Defendants did not terminate Ms. Kerlo.

140. Defendants did not terminate other white and/or female employees involved in similar exploration of channel partnerships or similar commission sharing agreements.

141. Defendants did not terminate other white and/or female employees using assertive language to discuss commission sharing agreements or in a manner similar to Mr. Soares.

142. Other employees who did not complain about racial discrimination were not terminated.

143. Defendants refused to take any action to adequately investigate, remediate, stop, prevent, or otherwise address the discrimination and retaliation suffered by Mr. Soares.

144. The actions of Defendants were intentional and merit imposition of punitive damages to the maximum extent permissible by law.

145. As a result of the discrimination and retaliation described herein, Mr. Soares suffered pecuniary and non-pecuniary damages, including loss of income and benefits, severe emotional distress, mental anguish, damage to his reputation and has incurred attorney's fees in this matter.

146. This Complaint does not have an exhaustive list of wrongful acts or omissions by Defendants.

147. This Complaint was prepared and drafted, including the wording of specific allegations, by counsel and is not intended to be a verbatim statement of Complaint.

### COUNT I
### Plaintiff v. All Defendants
### Disparate Treatment (Race/Color) in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

1-147. Plaintiff realleges and incorporates by reference all preceding Paragraphs of Complaint of this Complaint, as if fully set forth herein this Paragraph of this Complaint.

148. Defendants removed work responsibilities on October 20, 2020, and terminated Plaintiff on October 22, 2020, because of his race and color as set forth herein this Complaint which constitutes a violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

149. Defendants' conduct has been intentional, deliberate, willful and conducted with disregard of the rights of the Plaintiff.

150. By reason of Defendants' discriminatory employment practices based upon race and color, Plaintiff has experienced emotional distress, humiliation, mental anguish, loss of compensation and employment, and as such, is entitled to all legal and equitable remedies available under the Civil Rights Act of 1866.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.  Judgement against Defendants, jointly and severally, for Plaintiff in an amount sufficient to fully compensate Plaintiff for all non-pecuniary damages sustained, including but not limited to full compensation for his emotional distress, mental anguish, humiliation and loss of reputation;

b.  Judgement against Defendants, jointly and severally, for Plaintiff in an amount sufficient to fully compensate Plaintiff for all pecuniary damages sustained, including but not limited to front pay, back pay, lost income and benefits

c.  Judgement against Defendants, jointly and severally, for Plaintiff for punitive damages;

d.  Judgement against Defendants, jointly and severally, for Plaintiff for the reasonable attorney's fees and costs incurred by Plaintiff prosecuting this action;

e.  Judgement against Defendants, jointly and severally, for Plaintiff for pre-judgment and post-judgment interest at the highest rate permitted by law; and

f.  Any and all other relief that this Honorable Court may deem just and equitable.

### COUNT II
**Plaintiff v. All Defendants**
**Disparate Treatment Retaliation in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981**

1-147.  Plaintiff realleges and incorporates by reference Paragraphs 1-147 of this Complaint, as if fully set forth herein this Paragraph of Count II of this Complaint.

148.  Plaintiff engaged in activity protected by Section 1981 when he opposed and complained of racially disparate treatment, as described herein this Complaint.

149.  Defendants had actual knowledge of Plaintiff's protected activity.

20

150. Defendants removed work responsibilities on October 20, 2022, and terminated him on October 22, 2022, because of Section 1981 protected activity and therefore violated the Civil Rights Act of 1866, 42 U.S.C. § 1981 and 1981(a).

151. Defendants' conduct has been intentional, deliberate, willful and conducted with disregard of the rights of the Plaintiff.

152. By reason of Defendants' discriminatory employment practices in violation of the Civil Rights Act of 1866, Plaintiff has experienced harm, including loss of compensation, wages, back and front pay, damages and other employment benefits, and as such, are entitled to all legal and equitable remedies available under the Civil Rights Act of 1866.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a. Judgement against Defendants, jointly and severally, for Plaintiff in an amount sufficient to fully compensate Plaintiff for all personal damages sustained, including but not limited to full compensation for his emotional distress, mental anguish, humiliation and loss of reputation;

b. Judgement against Defendants, jointly and severally, for Plaintiff in an amount sufficient to fully compensate Plaintiff for all pecuniary damages sustained, including but not limited to front pay, back pay, lost income and benefits

c. Judgement against Defendants, jointly and severally, for Plaintiff for punitive damages;

d. Judgement against Defendants, jointly and severally, for Plaintiff for the reasonable attorney's fees and costs incurred by Plaintiff prosecuting this action;

e. Judgement against Defendants, jointly and severally, for Plaintiff for pre-judgment and post-judgment interest at the highest rate permitted by law; and

f.   Any and all other relief that this Honorable Court may deem just and equitable.

JURY TRIAL DEMANDED.

Respectfully submitted,

KREITMAN LAW, LLC.


By: __/s/ Nicholas Kreitman
       Nicholas Kreitman
       Plaintiff's Attorney

Nicholas Kreitman
Kreitman Law, LLC
#6313283
505 North La Salle Dr.
Suite 500
Chicago, IL 60654
(847) 970-0575
njk@kreitmanlaw.com